1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| OFELIA DE LA CRUZ, | ) | 1:09cv01222 DLB |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**BACKGROUND**

Plaintiff Ofelia De La Cruz ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

**FACTS AND PRIOR PROCEEDINGS[1]**

Plaintiff filed her applications for DIB and SSI in April 2006.  She alleged disability since August 15, 2001, due to a lower back injury and pain throughout the body.  AR 145-52.  After

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

Plaintiff's applications were denied initially and on reconsideration, she requested a hearing

before an Administrative Law Judge ("ALJ").  AR 78-82, 86-90, 92.  On February 26, 2008, ALJ

Christopher Larsen held a hearing.  AR 25-55.  He denied benefits on June 21, 2008.  AR 11-24.

The Appeals Council denied review on May 13, 2009.  AR 1-5.

Hearing Testimony

ALJ Larsen held a hearing in Fresno, California, on February 26, 2008.  Plaintiff

appeared with her attorney, Melissa Proudian, and a Spanish interpreter.  Vocational expert

("VE") Jose L. Chaparro also appeared and testified.  AR 17, 27.

Plaintiff was born in 1969.  She is five feet tall and weighs 142.  She recently lost over

100 pounds.  The doctor requested that she lose weight for back and neck surgery.  AR 30-31.

Plaintiff is married.  She has four children, ages 17, 13, 9 and 7.  She drives them to

school in the morning and they come back on the bus.  AR 31-32.

Plaintiff completed the sixth grade in Mexico.  She did not get a GED or diploma in the

United States.  She cannot read or write in English.  She can hardly speak or understand any

English.  If she was lost, she could not ask for, or understand, directions in English.  She can read

and write in Spanish.  She has not had vocational training.  AR 33-34.

Plaintiff testified that she last worked on August 16, 2001.  She was sorting tomatoes.  It

was a three-month seasonal job.  She worked full-time during the season for more than 10 years.

The heaviest weight she lifted was 20 pounds.  She was injured on the job, falling and hurting her

back, neck and legs.  She went to work the following day, but did not continue after that.  She

has been in medical treatment since August 17, 2001, and has an ongoing Workers'

Compensation case.  AR 34-37.

Plaintiff does not feel that she could do any job eight hours a day, five days a week

because she has a lot of pain in her lower back, neck and legs, both of her knees hurt and she has

pain in the bones of her legs.  She has pain in her back radiating down to her legs.  Her pain is an

8 on a scale of 1 to 10.  Cold or movement aggravate it.  AR 36-38.

1   Plaintiff testified that the longest she can sit is an hour.  She can stand around an hour.

2   She has a cane.  Dr. Fontana, a physical therapist, prescribed it in 2001.  She can walk about a

3   block with the cane.  AR 38-41.

4   Plaintiff testified that since she got hurt, she has not picked up anything heavy.  The

5   heaviest thing she lifts is her purse, which is less than 10 pounds.  She never lifts anything over

6   10 pounds.  AR 41-42.

7   Plaintiff's pain medication takes away the pain in her back completely, but it causes her

8   to feel dizzy and sleepy enough to lie down.  She lies down once or twice a day for one to three

9   hours.  She has been doing that since 2006.  AR 42-43.  Plaintiff takes Vicodin.  She wears a

10  Lidoderm patch everyday, either in the daytime or the nighttime.  She has had physical therapy,

11  but it did not help.  A doctor wanted to give her injections for pain, but her insurance said no.

12  She has been seen for possible surgery of her back.  A doctor in Fresno told her that he did not

13  recommend surgery and she would be worse off.  The weight loss helped her for the leg pain, but

14  not her lower back.  She is going to see a surgeon in Los Angeles, but has not made an

15  appointment.  AR 43-45.

16  Plaintiff testified that she can reach overhead with either arm to get something out of a

17  cupboard.  She can reach at shoulder height with either arm, but every movement bothers her

18  lower back.  She did not know if she could bend over and pick something up off the ground.  She

19  has not done it.  AR 45.

20  Plaintiff testified that her daughter or husband help her put on clothes.  She can bathe

21  herself, but tries not to make too much movement.  She can keep her mind on something for 5 or

22  10 minutes.  She would have to take an hour break before she could go back to concentrating for

23  another 5 to 10 minutes.  With all the pills, she gets a lot of depression.  AR 45-46.

24  Plaintiff says she hardly eats anymore.  She goes to Weight Watchers and doesn't eat as

25  much or make food.  Her daughter does the cleaning.  Plaintiff always has pain in her legs.  She

26  has pain in her neck three or four days a week.  AR 46-47.

27

28

1    The VE also responded to questions from the ALJ.  The VE testified that Plaintiff's past

2    job as an agricultural produce sorter is light, unskilled work.  As performed, it was medium

3    work.  Plaintiff's work as a fruit harvest worker is medium and unskilled.  AR 47-49.

4    For the first hypothetical, the ALJ asked the VE to assume a worker of Plaintiff's age,

5    education and work experience.  This person could stand and walk a total of two hours in an

6    eight hour day, but must have a cane.  This person could sit a total of four hours in eight hour

7    day.  The VE testified that this person could not perform Plaintiff's past relevant work or any

8    other work.  AR 50.

9    For the second hypothetical, the ALJ asked the VE to assume a worker of Plaintiff's age,

10   education and work experience.  This person could lift and carry 10 pounds occasionally, less

11   than 10 pounds frequently, could stand and walk a total of 2 hours with a cane and could sit a

12   total of 6 hours in an 8 hour day.  This person could never climb ladders, ropes or scaffolds.  She

13   could occasionally stoop, balance, kneel, crouch, crawl and climb ramps or stairs.  She must

14   avoid concentrated exposure to hazards.  She occasionally could work overhead with bilateral

15   arms and hands.  The VE testified that with these limitations, the hypothetical worker could not

16   perform Plaintiff's past relevant work.  AR 50.

17   Assuming no English, the VE believed there were other jobs she could perform in the

18   regional or national economy.  There were several classifications.   Each one of the jobs was

19   probably a low number, but in combination, there were about 4,000 jobs in California and about

20   39,800 jobs nationally.  For example, one job is bench hand, which is sedentary, unskilled with

21   100 to 200 jobs in California and 1,200 nationally.  Another job is crystal attacher, which is

22   sedentary, unskilled with 100 to 200 jobs in California and 1,200 nationally.  There is nut sorter,

23   which is sedentary, unskilled with 100 to 200 jobs in California and 1,100 nationally.  AR 50-51.

24   Plaintiff's attorney asked the VE to assume the second hypothetical and add the need for

25   breaks during the day of a one hour maximum and concentration in increments of 5 to 10 minutes

26   with an hour break in between.  The VE testified that all jobs would be eliminated by either of

27   the limitations.  The VE's testimony was consistent with the Dictionary of Occupational Titles

28   and Selected Characteristics of Occupations.  AR 52.

Medical Record

On September 20, 2001, Frank A. Fontana, D.C., a chiropractor, completed a Doctor's First Report of Occupational Injury or Illness.  Plaintiff reported that she was walking, fell, did the splits and landed on her knees.  Dr. Fontana diagnosed cervical sprain or strain, cervical vertebral subluxation, thoracic sprain/strain and thoracic subluxation.  He requested authorization for an MRI, nerve conduction tests and videofluoroscopy.  AR 231.  Plaintiff continued to receive treatment from Dr. Fontana between October 2001 and May 2002.  AR 214-30.

A November 2001 videofluoroscopy of the lumbar spine was negative for obvious signs of gross fractures, dislocations and/or aberrant kinematic motion.  Plaintiff had Grade I to Grade II spondylolisthesis of L5 on S1, and a possible pars defects suggested at L5.  AR 185-85.

On December 2, 2001, Plaintiff underwent a biomechanical analysis with videofluoroscopy.  At the C5 vertebral level, she had a loss of motion segmental integrity rated at 25% impairment for the cervical-thoracic spine.  She had laxity and/or compromization of the posterior supportive soft tissue structures and capsular structures at the C2/C3 level.  She also had ligamentous and capsular laxity at multiple levels.  AR 187-88.

On December 12, 2001, Brendan V. McAdams, M.D., a board certified orthopaedic surgeon and qualified medical evaluator, completed an orthopaedic evaluation.  Plaintiff reported that since her fall, she had been treating only with a chiropractor.  She chiefly complained of pain in the back with some pain going to the bottom of her feet.  She also had pain in both knees and increased discomfort in the groin area.  AR 198-99.

On physical examination, Plaintiff gave the impression of being in a considerable amount of pain by walking with cane with a rather shuffling gait, bent over and somewhat dragging her left leg.  She sat throughout the interview appearing comfortable.  She "would not move her back in any way, shape or form of flexion, extension, lateral bending and lateral rotation."  She would not walk on the heels and toes.  She would not squat down.  When asked to sit on the table, it took her a full minute to get up onto it.  In trying to do straight leg raising, she would not raise the leg more than two inches off the table.  She was not asked to assume the prone position because "she was so corpulent that it would be extremely difficult to get her to move onto her

abdomen." She was assisted to a sitting position and "miracle of miracles with the lady sitting both upright with both legs fully extended, she had no complaint." AR 199-200.

Dr. McAdams reviewed Plaintiff's records, noting that an initial incident report stated that the she slipped and fell to the knees and Madera Community Hospital described a contusion of the knee bilaterally. Dr. McAdams' final diagnosis was "Malingering." He opined that she was "vastly over exaggerating her amount of pain and totally manipulating the physical examination. She is easily confused and clearly shows that she is manipulating the exam." Dr. McAdams found "no reason whatsoever to continue any kind of treatment" and no reason that Plaintiff "should be suffering the amount of discomfort she is alleging with such a[] minimal injury." AR 201-02.

On January 5, 2002, Donald D. Taylor, Jr., D.C., completed a QME exam at the request of Plaintiff's attorney. Plaintiff reported that while at work on August 16, 2001, she slipped and fell, landing on both knees, almost doing the splits with her legs. She returned back to work that day and the next. On the third day, she was unable to work because of too much pain. She was sent to Madera Community Hospital, where x-rays showed no acute fracture or dislocation of the thoracic and lumbar spine. She had mild osteopenia and spina bifida occulta of L5. AR 178-79.

On examination, Plaintiff had sharp pain in her lower back during all ranges of motion, flexion/extension, lateral bending and rotation. Straight leg raising was 65 degrees on the left and 80 degrees on the right. Deep tendon reflexes were normal. She had positive patellar grinding bilaterally. She exhibited difficulty during attempted heel toe walking and was unable to squat and recover. Tests for inconsistencies revealed none in orthopaedic testing, but she exhibited and reported lower back pain during standing head compression, which was an inappropriate response. Dr. Taylor diagnosed acute lumbar sprain/strain and acute bilateral knee pain with accompanying myofascial pain in the lower extremities. He estimated that she would probably need to be off work three to four more months. AR 180-82.

A MRI of the lumbar spine taken on January 7, 2002, showed bilateral spondylolysis of the pars interarticularis of L5, with Grade 1 anterior spondylolisthesis and bilateral foraminal encroachment at L5-S1 in association. AR 193.

On March 14, 2002, Dr. McAdams reiterated his final diagnosis of malingering.  He opined that Plaintiff's multiple subjective complaints were not corroborated by any objective findings and "she totally manipulated the examination."  AR 195-96.

An electrodiagnostic report in April 30, 2002, showed abnormal findings.  AR 205-10.  A subsequent electrodiagnostic report completed by a board certified physician in September 2003 was normal.  AR 241-45.

On October 8, 2002, Michael J. Esposito, M.D., an orthopedic surgeon and qualified medical evaluator, completed an Initial Comprehensive Orthopedic Consultation.  On examination, Plaintiff did not appear to be in acute distress.  She ambulated with a normal gait and arose from a chair using a mild upper extremity assist.  She got on and off the examination table with some difficulty.  During examination of her dorsolumbosacral spine and lower extremities, she stood in an upright position and flexed with her hands to approximately her mid femurs, with poor effort.  Her right and left lateral bending was markedly restricted to 10 degrees, but was dependent on effort.  Dr. Esposito diagnosed Plaintiff with lumbar grade 1 spondylolisthesis at L5-S1 level with associated lumbar facet syndrome, bilateral knee contusions with medial compartment osteoarthritis of both knees, status post open reduction internal fixation of the left mid shaft femur fracture and cervical degenerative disc disease at C5-C6 region with mild cervical degenerative disc disease.  He recommend that Plaintiff take Vioxx for her neck, low back and bilateral knee symptoms, but her subjective complaints and the objective findings did not warrant surgical intervention.  AR 263-71.

On November 21, 2002, Merlin C. Smith, M.D., an orthopedic surgeon, completed a Qualified Medical Examination.  AR 345.  Dr. Smith diagnosed Plaintiff with musculoligamented strain of the lumbosacral spine, grade 1 spondylolisthesis at L5 on S1 associated with bilateral spondylosis, per MRI, and chondromalacia patella bilaterally associated with synovitis on the left side.  Dr. Smith opined that Plaintiff was precluded from heavy lifting and from repetitive bending and stooping to prevent low back symptoms.  She also was precluded from going up and down stairs, squatting or kneeling to prevent left knee pain.  She did not appear to be a candidate for vocational rehabilitation.  AR 345-51.

On December 5, 2002, Dr. Smith opined that Plaintiff had a permanent impairment, but could return to her usual job with restrictions.  AR 344.

On January 18, 2003, Norman Y. Otsuka, M.D., a board certified orthopedic surgeon and qualified medical examiner, diagnosed Plaintiff with cervical spine, lumbar spine and bilateral knee strain.  He characterized her subjective complaints in cervical spine as frequent and slight.  He characterized her low back pain as constant slight and her bilateral knee pain as occasional slight moderate.  On examination, she walked with an antalgic gait and was unable to walk on her toes, heels and squat.  Straight leg raising was positive.  She had four positive Waddell's signs.  Dr. Otsuka opined that Plaintiff had a disability to her neck and back that would preclude very heavy lifting.  She had a disability to her bilateral knees that would preclude running, jumping and repetitive squatting and kneeling.  AR 233-40.

On August 12, 2003, Plaintiff saw Dr. Esposito for a reevaluation of her condition.  She continued to complain of persistent pain in her low back, with radiating pain to both legs.  She also complained of bilateral knee pain.  She was to continue with non-steroidal anti-inflammatory medication.  She did not wish to have an epidural cortisone injection.  AR 259-62.

On September 10, 2003, Plaintiff saw Dr. Esposito for complaints of increasing pain in her low back and left leg.  She had marked deficiencies and an inability to ambulate with increasing left leg pain and associated weakness.  She complained of left leg radiculitis.  Dr. Esposito recommended a pain management referral for an epidural steroid series of injections.  AR 255-58.

On January 27, 2004, Dr. Esposito completed a Secondary Treating Physician's Supplemental Orthopedic Report.  He did not feel that Plaintiff was a surgical candidate.  He recommended that she avoid performing overhead activities, heavy lifting, repetitive bending and stooping, and prolonged weightbearing activities.  She also should avoid repetitive squatting, kneeling and climbing activities.  AR 246-51.

On August 15, 2004, Plaintiff reported to John Arakelian, D.C., that her lower back pain was occasionally minimal while sitting and intermittently slight while walking, standing, and squatting.  Her lower back pain was constantly severe while bending at the waist, climbing stairs,

kneeling and crawling.  It was frequently moderate when twisting her back and while lifting from her waist to her shoulders.  AR 309.

Electronic muscle testing of Plaintiff's lower extremities on August 18 and October 11, 2004, were abnormal.  AR 281-86, 304-07.  Range of motion studies dated September 23, 2004, showed lumbar spine range of motion at less than 85% of normal range.  AR 289.

On December 9, 2004, Dr. Smith prepared a supplemental report.  He opined that additional records seemed to verify that Plaintiff felt the need for ongoing chiropractic treatment and that she was continuing to have considerable pain in her knee and back.  AR 341-43.

On September 6, 2005, Robert E. Lieberson, M.D., a neurological surgeon, completed an agreed medical-legal evaluation.  Plaintiff was described as a fit-appearing, but somewhat overweight woman who walked with a cane in the right hand.  She was 5'0" and 262 lbs.  Dr. Lieberson noted that examination of the lumbar spine was difficult to test because of pain. Plaintiff essentially was unable to bend or extend.  Credibility testing, including Waddell's, was unremarkable.

Dr. Lieberson reviewed medical records documenting a spondylolysis with spondylolisthesis and treatment records indicating that Plaintiff was either totally disabled or had no injury whatsoever.  Dr. Lieberson reported that a spondylolysis is a fracture and a spodylolisthesis is a slippage secondary to a fracture.  He indicated that these fractures are not uncommon in the population and 7-10% of the population has an asymptomatic spondylolysis with spondylolisthesis.  He opined that earlier reports of physicians claiming that there was no injury and no need for treatment "seem ill considered at best."  The quantity of chiropractic also seemed unusual, because it "is ordinarily of little or no benefit for this problem."  Dr. Lieberson found that Plaintiff had been permanent and stationary since November 21, 2002.  He diagnosed her with cervical and lumbar disc disease.  He opined that she had "probably lost about 75% of her original ability to bend, stoop, lift, push, pull, climb, and perform other activities involving comparable physical effort."  The fracture in the back, coupled with her excessive weight, had resulted in a very substantial disability.  Dr. Lieberson stated that additional medical care would be required, but before any surgeon would consider an operation, Plaintiff would need to lose

approximately 80 to 100 pounds.  If the weight loss did not result in improvement, then

consideration of a lumbar fusion would be appropriate.  Dr. Lieberson concluded that Plaintiff

could not return to her usual work, but could perform work of some sort and would be a good

candidate for vocational rehabilitation.  AR 352-63.

On November 17, 2005, Berj Kalamkarian, M.D. evaluated Plaintiff on referral from an

attorney.  Plaintiff was noted to be 5'2.5" and 242.5 pounds. She rated her pain at 9 out of 10.  On

examination, she could not tiptoe or heel walk due to pain.  On lumbar range of motion, she

preferred not to bend or extend due to severe aggravation of pain.  On muscle power, there was

lack of effort and quite weak to manual evaluation.  Dr. Kalamkarian assessed her with

discogenic disease of the lumbar and cervical spine.  She was not a good candidate for surgery

due to being overweight and an appropriate treatment would be epidural steroid injections.  She

was prescribed Vicodin 5/500 mg for severe pain.  AR 383-84.  Plaintiff continued with

treatment from Dr. Kalamkarian's office between January 5, 2006, and January 18, 2008.  AR

377-81, 387-96, 399-402, 407-08.

On July 7, 2006, Benjamin Chang, M.D., completed a consultative orthopedic

examination.  On examination, Plaintiff weighed 177 pounds and walked with a mildly antalgic

gait with a single point cane.  Dr. Chang diagnosed Plaintiff with chronic mechanical low back

pain.  He opined that she was unable to perform work that required frequent bending and heavy

lifting.  She could lift and carry 20 pounds occasionally and 10 pounds frequently.  She could

stand and walk six hours out of an eight hour day with normal breaks.  She could sit without

restriction.  She occasionally could kneel, squat and climb stairs.  AR 364-68.

On July 18, 2006, I. Ocrant, a state agency medical consultant, completed a Physical

Residual Functional Capacity Assessment form.  Dr. Ocrant opined that Plaintiff could lift 10

pounds occasionally and frequently.  She could stand and/or walk at least 2 hours in an 8-hour

workday.  A medically required hand-held assistive device was necessary for ambulation.  She

could sit about 6 hours in an 8-hour workday.  She could push and/or pull without limitation in

her lower extremities, but she was limited in her upper extremities.  She occasionally could climb

ramps and stairs, but never ladders, ropes or scaffolds.  She occasionally could balance, stoop,

kneel, crouch and crawl.  She was limited bilaterally to occasional overhead work.  She had no visual or communicative limitations.  She should avoid concentrated exposure to hazards (machinery, heights, etc.).  Dr. Ocrant indicated that his opinion was largely consistent with Dr. Lieberson's opinion.  AR 369-73.

On November 27, 2006, Dr. Kalamkarian indicated that Plaintiff had continuous chronic low back pain not relieved following the loss of 101 pounds.  He ordered an MRI of the lumbar spine.  AR 374-75.  The MRI report dated January 15, 2007, reportedly identified spondylolisthesis with features of bilateral pars defect at L5 with disc herniation and central stenosis at L5-S1.  AR 405-06.

In April 2007, Dr. Kalamkarian recommended evaluation by a neurosurgeon.  AR 403-04.

On July 31, 2007, Dr. Kalamkarian's treatment notes reflected receipt of a report from Dr. Watson, a local orthopedic surgeon, dated June 25, 2007.  Dr. Watson reportedly felt there may be "some symptom amplification" by Plaintiff, and he was somewhat reluctant to recommend surgery or to obtain a discogram.  He felt a repeat MRI was advisable.   AR 397-98.

On January 15, 2008, Dr. Kalamkarian noted that Plaintiff was awaiting a consult with UCLA and continued to have low back pain radiating to her lower extremities.  AR 387-88.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through June 30, 2006.  She had not engaged in substantial gainful activity since August 15, 2001.  The ALJ determined that Plaintiff had the severe impairments of lumbar degenerative disk disease, lumbar spine spondylolisthesis and bilateral patella chondromalacia.  Despite these impairments, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to lift/carry 10 pounds occasionally and less than 10 pounds frequently.  She could stand or walk a total of two hours in an eight-hour workday while using a cane and could sit a total of six hours in an eight-hour workday.  She occasionally could stoop, kneel, balance, crouch, crawl, climb ramps or stairs and work overhead with the upper extremities.  She could never climb ladders, ropes or scaffolds and she must avoid concentrated exposure to workplace hazards.  The ALJ concluded that Plaintiff

could not perform any past relevant work, but she could adjust successfully to other work that existed in significant numbers in the national economy.  AR 19-23.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

1   In an effort to achieve uniformity of decisions, the Commissioner has promulgated

2   regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

3   C.F.R. §§ 404.1520 (a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1)

4   had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an

5   impairment or a combination of impairments that is considered "severe" (lumbar degenerative

6   disk disease, lumbar spine spondylolisthesis and bilateral patella chondromalacia) based on the

7   requirements in the Regulations (20 CFR §§ 404.1520(c), 416.920(c)); (3) does not have an

8   impairment or combination of impairments which meets or equals one of the impairments set

9   forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work;

10  but (5) can perform jobs that exist in significant numbers in the national economy.  AR 19-23.

11      Here, Plaintiff argues that the ALJ (1) failed to give appropriate weight to the opinion of

12  Dr. Lieberson, the worker's compensation examiner; and (2) failed to properly evaluate her

13  obesity.

**DISCUSSION**

14

15  A.      Evaluation of Worker's Compensation Physician

16      Plaintiff contends that the ALJ erred by giving substantial, but not controlling, weight to

17  the opinion of Dr. Lieberson, the agreed medical examiner in Plaintiff's worker's compensation

18  case.  Plaintiff first argues that the ALJ "failed to provide any analysis demonstrating that he

19  even attempted to translate the limitations assessed by [Dr. Lieberson], which are in worker's

20  compensation terms, into Social Security terminology."  Opening Brief, p. 9.  As Plaintiff admits,

21  however, an ALJ's decision need not contain an explicit "translation," but should at least indicate

22  that the ALJ recognized the differences between the worker's compensation scheme and the

23  Social Security scheme, and took those differences into account in evaluating the medical

24  evidence.  *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)*;*

25  *Booth v. Barnhart*, 181 F.Supp.2d 1099, 1106 (C.D.Cal. 2002); *Mejia-Raigoza v. Astrue*, 2010

26  WL 1797245, *8 (E.D.Cal. May 3, 2010).

27      Here, there is no indication that the ALJ failed to recognize that a distinction exists

28  between the worker's compensation scheme and the Social Security scheme.  In discussing Dr.

13

1   Lieberson's opinion, the ALJ noted that he examined Plaintiff as a workers' compensation

2   agreed medical examiner.  AR 21, 22.  The ALJ also acknowledged Dr. Lieberson's opinion that

3   Plaintiff had lost about 75 percent of her ability to bend, stoop, lift, push, pull, or climb.  AR 21,

4   352-63.  In formulating the RFC, the ALJ concluded that Plaintiff could occasionally stoop,

5   kneel, balance, crouch, crawl, climb ramps or stairs, could occasionally work overhead with the

6   upper extremities and could never climb ladders, ropes or scaffolds.  AR 20.  Plaintiff does not

7   explain how the resulting RFC is an incorrect "translation" of the limitations assessed by Dr.

8   Lieberson.  Further, opinions concerning degrees of disability peculiar to worker's compensation

9   are not conclusive in a Social Security case.  20 C.F.R. §§ 404.1504, 416.904; *Macri v. Chater*,

10  93 F.3d 540, 544 (9th Cir. 1996) (citing *Desrosiers,* 846 F.2d at 576).

11           Rather than identifying the incorrect portions of the RFC, Plaintiff instead suggests that

12  the ALJ should have accepted Dr. Lieberson's opinion that she was disabled, asserting that this

13  view is consistent with Dr. Merlin Smith's assessment that her disability was so severe she could

14  not even attend vocational rehabilitation.  Opening Brief, p. 10.  There are a number of problems

15  with Plaintiff's argument.  First, Dr. Lieberson opined that Plaintiff would be a good candidate

16  for vocational rehabilitation, whereas Dr. Smith did not.  AR 350, 363.  Second, Plaintiff ignores

17  Dr. Lieberson's finding that she could perform work of some sort and Dr. Smith's indication that

18  she could return to work with restrictions.  AR 362, 344; *cf. Mattox v. Astrue*, 2008 WL 761073,

19  *9 (E.D.Cal. Mar. 17, 2008) (physician evaluating plaintiff in worker's compensation case is

20  focused on deciding whether she could return to her past job).  Third, a finding of disability

21  under the worker's compensation scheme does not bind the Commissioner.  20 C.F.R.

22  §§404.1504, 416.904.  Indeed, an ALJ is "not bound by an expert medical opinion on the

23  ultimate question of disability."  *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social

24  Security Ruling ("SSR") 96-5p.

25           Plaintiff next argues that Dr. Lieberson's opinion was consistent with the assessments of

26  the treating doctors at Comprehensive Pain Management.  Plaintiff points to findings that up to

27  one month before the hearing, she was assessed with chronic low back pain.  Opening Brief, p.

28  11.  The cited records reflect Plaintiff's reports of pain and include multiple instances when she

1   refused or preferred not to perform certain actions on examination.  AR 376-77, 379, 380-81,

2   383, 391, 399, 403, 406, 407.  Plaintiff does not explain how her subjective reports of pain and

3   refusals are consistent with Dr. Lieberson's opinion or are equated with functional limitations as

4   to how long she can sit, stand or walk or how much weight she can lift or carry.

5        Moreover, the ALJ gave the opinions of Plaintiff's treating sources less evidentiary

6   weight because they might be tainted by Plaintiff's lack of credibility.  AR 22.  An ALJ may

7   reject a treating physician's opinion because it was based on the claimant's discredited subjective

8   complaints.  *Thomas v. Barnhart,* 278 F.3d 948, 957 (9th Cir. 2002); *Morgan v. Comm'r of Soc.*

9   *Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (physician's opinion based to a large extent on

10  claimant's own accounts of symptoms and limitations may be disregarded where those

11  complaints have been properly discounted); *Fair v. Bowen*, 885 F.2d 597, 605 (9th 1989).  Here,

12  the ALJ cited the diagnosis of malingering by an orthopedic surgeon.  AR 20.  The record reflects

13  that in December 2001, Dr. McAdams diagnosed Plaintiff with malingering and found that she

14  manipulated the examination.  AR 198-203.  Affirmative evidence of malingering will support an

15  adverse credibility finding.  *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

16       Plaintiff takes exception with the ALJ's reliance on Dr. McAdams' diagnosis of

17  malingering.  Plaintiff contends that Dr. Lieberson found the diagnosis of malingering by Dr.

18  McAdams to be "ill conceived at best" because he was not aware that Plaintiff was suffering

19  from a spinal fracture and did not review x-rays or an MRI.  Opening Brief, p. 15.  According to

20  the record, Dr. Lieberson did not directly identify Dr. McAdams' diagnosis.  Instead, Dr.

21  Lieberson commented that "earlier reports of physicians claiming there was no injury and no

22  need for treatment seem ill considered at best."  AR 361.  Further, on March 14, 2002, Dr.

23  McAdams reiterated his final diagnosis of malingering and his opinion that Plaintiff "totally

24  manipulated the examination."  AR 195-96.  This supplemental opinion was rendered after a

25  lumbar MRI showed bilateral spondylolysis of the pars interarticularis of L5, with Grade 1

26  anterior spondylolisthesis.  AR 193.  The record does not reflect whether or not Dr. McAdams

27  had the opportunity to review the available MRI findings.  However, even if the ALJ's reliance

28  on the malingering diagnosis was error, Plaintiff does not challenge the ALJ's other reasons for

15

1  discounting her subjective complaints.  *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004)

2  (upholding ALJ's credibility determination even though one reason may have been in error).

3          In addition to the malingering diagnosis, the ALJ found subsequent record evidence that

4  Plaintiff exaggerated her symptoms.  AR 21.  For instance, the ALJ noted that in June 2007, Dr.

5  Kalamkarian reviewed a report from another of Plaintiff's treating physicians, who felt that

6  Plaintiff was engaging in "symptom amplification."  AR 397.  Symptom exaggeration is a valid

7  basis for discounting credibility.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

8          Additionally, the ALJ found that Plaintiff answered questions evasively at the hearing.

9  He pointed out that Plaintiff testified she did not know how much she could lift because she

10  never lifted anything and she did not know how long she could sit because she never timed

11  herself.  AR 21, 38, 41-42.  The ALJ also pointed to Plaintiff's testimony that she could sit for 20

12  minutes and then subsequent testimony that she could sit 60 minutes.  AR 21, 38.  Such

13  inconsistencies support an adverse credibility determination.  *See, e.g., Tonapetyan*, 242 F.3d at

14  1148 (ALJ may use ordinary techniques of credibility evaluation, such as inconsistent

15  statements); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir.1991) (ALJ may discredit claimant's

16  allegations based on inconsistencies in the testimony or on relevant character evidence).

17          Plaintiff has not argued that the ALJ's additional credibility findings are unsupported or

18  are error.  Where, as here, the ALJ has made specific findings justifying a decision to disbelieve

19  an allegation of excess pain, and those findings are supported by substantial evidence in the

20  record, our role is not to second-guess that decision.  *Fair*, 885 F.2d at 604.

21          Plaintiff next argues that the ALJ improperly based her RFC on the opinion of the non-

22  examining state agency medical consultant.  Reports of a non-examining physician may serve as

23  substantial evidence when they are supported by other evidence in the record and are consistent

24  with it.  *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

25          To the extent that Plaintiff suggests that the opinion of the non-examining physician, Dr.

26  Ocrant, is not consistent with Dr. Lieberson's opinion, this suggestion is unpersuasive.  As noted

27  by the ALJ, Dr. Ocrant analyzed the medical opinions in the record.  In particular, Dr. Ocrant

28  expressly considered Dr. Lieberson's opinion regarding a 75% reduction in lifting and posturals

and found it "largely consistent." AR 373.  Dr. Ocrant indicated that the only difference was that Dr. Lieberson's opinion did not note the use of a cane.  Based on the cane, Dr. Ocrant opined that additional lifting restrictions would be reasonable.  AR 373.  Plaintiff does not explain how the opinions of Drs. Ocrant and Lieberson are inconsistent, except to suggest that the ALJ erred by not accepting Dr. Lieberson's conclusion that Plaintiff was disabled.  As discussed above, the ALJ is not bound by an expert medical opinion on the ultimate question of disability.  *Tomasetti*, 533 F.3d at 1041.

Plaintiff next complains that the non-examining physician did not have the opportunity to review the entire medical record, but does not explain how this would change the physician's opinion.

Plaintiff next complains that the MRIs speak for themselves and Plaintiff needs spinal surgery to repair her pars interarticularis.  Opening Brief, p. 12.  Contrary to Plaintiff's assertion, the record does not conclusively reflect that Plaintiff needs spinal surgery to repair her pars interarticularis.  In fact, the record reflects that Dr. Esposito did not feel that Plaintiff was a surgical candidate, and Dr. Watson, a local orthopedic surgeon, was somewhat reluctant to recommend surgery because of symptom amplification.  AR 246-51, 263-71, 397-98.  Although Plaintiff was awaiting a consult with UCLA, she had not made an appointment and there was no indication that surgery would be recommended.  AR 43-45, 387-88.

B.    Obesity

Plaintiff argues that the ALJ failed to comply with SSR 02-1p when evaluating the effects of obesity on her ability to work.  Plaintiff's argument is without merit.  SSR 02-1p directs an ALJ to consider a claimant's obesity in determining, among other things, whether the impairment is severe and whether the impairment prevents the claimant from doing past relevant work or any other work.  The ruling cautions, however, that "we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record." SSR 02-1p.

1    Plaintiff has not shown how the ALJ failed to comply with SSR 02-1p and the directive that

2    each case be evaluated on the record.  Plaintiff presented no evidence of obesity limitations that

3    were overlooked.  As Plaintiff points out, Dr. Lieberson considered the effects of Plaintiff's

4    obesity and issued an opinion regarding her ability to bend, stoop, lift, push, pull, and climb.  AR

5    362.  As discussed above, the ALJ gave substantial weight to Dr. Lieberson's opinion.  Plaintiff

6    has not identified any other treatment notes, evidence or testimony addressing her limitations due

7    to obesity that were not considered by the ALJ.  *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th

8    Cir. 2005).

9                                           **CONCLUSION**

10    Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

11   evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court

12   DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

13   Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael

14   J. Astrue, Commissioner of Social Security, and against Plaintiff Ofelia De La Cruz.

15

16    IT IS SO ORDERED.

17    Dated:    **August 4, 2010**                      **/s/ Dennis L. Beck**
                                               UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28